IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN ROBERT CERNIGLIA<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SACRAMENTO; SHERIFF LOU BLANAS; CAPTAIN HARRIS; SERGEANT DILLON; DEPUTY McGUIRE; DEPUTY KOBZA;  DEPUTY MENDOZA; DEPUTY KREMKIN; DEPUTY WINN; DEPUTY EDWARDS; DEPUTY HARRIS; DEPUTY HIDALGO; DEPUTY PETERSEN; and DEPUTY KOONTZ,<br><br>Defendants. | No. 2:99-cv-01938-JKS-DAD<br><br>MEMORANDUM DECISION AND ORDER<br>[Re:  Motions at Docket Nos. 139 and 144] |

I.  MOTIONS PRESENTED

Both parties have moved for summary judgment.  At Docket No. 139 Plaintiff has moved for summary judgment on the issue of liability.  At Docket 167 Defendants opposed the motion, to which Plaintiff replied at Docket No. 201.  At Docket No. 144 Defendants have moved for summary judgment on the issue of the existence of a legitimate non-punitive purpose.  At Docket 161 Plaintiff opposed, to which Defendants replied at Docket No. 194.

In addition to the principal motions, Plaintiff has objected to part of the evidence introduced by Defendants in support of their motion for summary judgment and in opposition to Plaintiff's motion for summary judgment.  At Docket No. 163 Plaintiff objects to all testimony of Deputy Daw and Sgt. Dillon filed in support of Defendants' motion for summary judgment with respect to the legitimate, non-punitive penological purpose of placing Plaintiff in T-Sep, to which Defendants replied at Docket No. 196.  At Docket No. 202, Plaintiff objects  to all testimony of Sgt. Dillon filed in support of Defendants' opposition to Plaintiff's motion for

summary judgment with respect to the legitimate, non-punitive penological purpose of placing Plaintiff in T-Sep.  At Docket No. 207 Plaintiff has objected to a portion of the declaration of K. Farrell.  Defendants replied to that objection at Docket No. 208.

## II.  NATURE OF THE ACTION/BACKGROUND

Plaintiff Robert Steven Robert Cerniglia, initially proceeding *pro se*, brought this civil rights action against the County of Sacramento, its sheriff and several deputy Sheriffs pursuant to 42 U.S.C. § 1983.[1]  He challenges the conditions of his confinement, alleging that he was placed in segregation, or "Total Separation" ("T-Sep") during the entire time he was awaiting court proceedings related to his recommitment as a Sexually Violent Predator ("SVP").  As a result he lacked socialization with the other prisoners, access to television and telephone in the dayroom, had limited outdoor exercise, and had cold food when he returned from court because all food was prepared and distributed at 3:00 p.m. and Cerniglia did not return from court until after 4:00 p.m.  In addition, he was required to shower in a dirty shower stall and subjected to strip searches when returning to the institution from court.  Also, as a result of being in T-Sep, he was not permitted to attend religious services with the other inmates.

Plaintiff was convicted of child sexual abuse on two separate occasions involving different children.  *See* Cal. Penal Code § 288(a).  Plaintiff was sentenced to probation for the first conviction, which revoked due to a probation violation and resulted in an additional sentence of six years of imprisonment.  For the second conviction he was sentenced to eleven years of imprisonment.  Once Plaintiff served his terms of imprisonment he was placed on parole and released into the community.  Shortly thereafter, he was arrested in connection with the

---

[1] 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

State's contention that he is a SVP).  As relevant to this action, Plaintiff has been recommitted twice, each time for the two-year period specified in the statute.  *See* Cal. Welf. & Inst. Code §§ 6600, *et seq*.  His first recommitment occurred June 16, 1997, after a jury trial in the state superior court.  His second recommitment occurred on June 16, 1999.  In this action, Plaintiff challenges the conditions of his confinement during the period May 6, 1999, to July 27, 1999, when, pursuant to statute, he was housed in the Sacramento County Jail while awaiting a determination at his second recommitment hearing.

On November 30, 2004, this Court granted Defendant's motion for summary judgment on the basis that the Defendants were entitled to qualified immunity and entered final judgment in their favor.  Plaintiff appealed to the Court of Appeals for the Ninth Circuit.  The Ninth Circuit reversed this Court and remanded the matter for further proceedings in light of *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004), and *Hydrick v. Hunter*, 466 F.3d 676 (9th Cir. 2006).[2]  The Court appointed *pro bono* counsel for Plaintiff, reopened discovery on a limited basis and granted leave to both parties to file motions for summary judgment addressing the issue of liability.  The parties have filed those motions

### III.  ISSUES PRESENTED

Defendants' motion presents the issue of whether the placement of Plaintiff in T-Sep promoted a legitimate penological goal.

Plaintiff's motion places at issue whether the acts of the Defendants violated Plaintiff's rights under the First (right of association/free speech), Fourth (unreasonable search and restraints) and Fourteenth (substantive and procedural due process/privacy) Amendments.

### IV.  UNDISPUTED FACTS

1.     Steven Robert Cerniglia ("Plaintiff") was confined at the Sacramento County Main Jail ("Main Jail") from May 6, 1999, through July 23, 1999, ("relevant time period") as a civil detainee, committed pursuant to California's Sexually Violent Predator Act, California Welfare & Institutions Code section 6600 et seq., awaiting a recommitment hearing.

---

[2] The Court notes that at the time the Ninth Circuit rendered its decision in this case, a petition for rehearing was pending in *Hydrick*.  Since that time a rehearing was granted in *Hydrick* and a superceding opinion was entered. 500 F.3d 978 (9th Cir. 2007), *cert. pending*.

MEMORANDUM DECISION AND ORDER
[Re:  Motions at Docket 139 & 144]
*Cerniglia v. Sacramento County*, 2:99-cv-01938-JKS-DAD     3

2.      During the relevant time period, Defendant Captain C. Scott Harris, Jr. was employed by the County of Sacramento Sheriff's Department as Captain of the Main Jail.

3.      During the relevant time period Defendant Sergeant Roger Dillon was employed by the County of Sacramento Sheriff's Department as a Sergeant in the Main Jail.

4.      During the relevant time period Defendants Thomas McGuire, Kevin Kobza, Gary Mendoza, Zachary Krempin, Lucius Winn, Manya Edwards, Jason Harris, Juan Hidalgo, Matthew Pterson, and Thomas Koontz, were employed by the Sacramento Sheriff's Department as Deputy Sheriff's.

5.      Defendants knew that California Penal Code §§ 4001 and 4002 require civil inmates to be housed separate and apart from criminal detainees.

6.      When inmates arrive at the Main Jail, they are processed through the booking area. Once it has been determined that the inmate will stay at the Main Jail, he is sent to an intake floor for classification. The classification officer conducts a brief interview with the inmate to determine the appropriate classification and housing assignment. As soon as there is a vacancy in the inmate's assigned housing unit, the inmate is transferred to that floor and pod.

7.      Classification officers review each inmate's classification periodically and may change it, if the inmate's behavior or other circumstances warrant.

8.      Classification officers have input into creating the classifications, but the ultimate decision is approved by the Sheriff.

9.      During and since the relevant time period, inmates have been divided into: general population, protective custody, administrative segregation, total separation ("T-Sep"), and civil.

10.     General population is for inmates who have no specific safety concerns and can be placed into the general population.

11.     Inmates who need protection from other inmates are assigned to protective custody. Examples of inmates who are placed in protective custody are child molesters, ex-gang members or informants.

12.  Administrative segregation inmates are inmates that are a risk to the general population and need to be more closely monitored.  This includes inmates with histories of excessive fights in jail with other inmates, assaultive behavior toward staff, escape risks, and inmates facing lengthy prison terms.

13.  T-Sep is assigned to inmates who need to be totally separated from other inmates. Reasons that an inmate would be placed in total separation include: assaultiveness towards other inmates, commission of a high-notoriety crime that other inmates might have a problem with, past or current law enforcement, some background that puts them at great risk of being assaulted by other inmates, lack of mental ability to function, or psychiatric issues.

14.  T-Sep and administrative segregation are sub-categories of special housing providing a higher degree of security, which is reserved for inmates with "assaultive in-custody history," "escape attempts from any custody facility during the past five years," and "in-custody discipline history."

15.  Civil is a classification for inmates who are brought into the Main Jail under civil, rather than criminal charges.

16.  During the relevant time period Plaintiff was classified as T-Sep.

17.  While detained at the Main Jail during his first Sexually Violent Predator Act ("SVPA") commitment hearing between August 1996 and June 1997, Plaintiff was housed as a civil detainee.  SVPA detainees are currently classified as civil detainees and housed on 3 East.

18.  General population, administrative segregation, protective custody, and civil inmates can receive visits and use the dayroom at the same time as other inmates in the same classification.

19.  T-Sep inmates are not allowed to interact with other inmates.  They are housed alone, receive social visits alone, and use the dayroom and outdoor recreation areas alone.

20.  The visiting rooms must be cleared of other inmates before a T-Sep inmate can see a visitor.

21. Although general population inmates are permitted to participate in group religious services or social service activities such as NA/AA meetings, T-Sep inmates are not permitted to participate. T-Sep inmates may, however, have one-on-one meetings with clergy and social workers.

22. Shortly before arriving at the Main Jail, Plaintiff graduated from the AA twelve-step program. Attending AA/NA meetings was part of Plaintiff's ongoing treatment protocol. Plaintiff had no access to Alcoholics Anonymous and Narcotics Anonymous meetings because he was classified as T-Sep

23. The Main Jail has eight floors. The first floor contains the lobby and booking loop, where detainees are booked into the Main Jail. The second floor contains the medical wing and administrative offices, the law library and social services. Inmates are housed on floors two through eight.

24. Floors three through eight are divided into an East and West Tower, with each floor divided into pods. Each side is divided into three pods except the West side of the seventh and eighth floors, which are divided into four pods each.

25. Each floor has a visiting area and outdoor recreation areas are shared by two floors.

26. With the exception of the 300 pod in the West Tower of the Main Jail, all pods are generally the same size, containing approximately 32 cells. Pods have two levels, with 16 cells on the upper level and 16 on the lower level.

27. Pods can contain different classifications of inmates, but inmates of different classifications do not share a cell.

28. Each pod has its own dayroom, which contains telephones, showers, picnic tables, and, usually, a television. There was no television in the dayroom of the 200 pod on 8 East in which Plaintiff was housed.

29. All inmates, regardless of classification, are entitled to receive dayroom time, and access to the dayroom is rotated. Under Main Jail Policy, general population prisoners are given as much access to the dayroom as possible. Inmates on T-Sep are required to receive at least one hour of dayroom access daily.

30.   During lockdown times, such as meal times, pill call, fights, emergencies and the movement of inmates on and off a floor, the dayroom is shut down and no inmates may access the dayroom.

31.   The eighth floor, East tower ("8 East") has three pods.  Plaintiff was housed in 8 East for the duration of his confinement, which also served as the "intake" floor housing inmates pending classification and assignment to housing with prisoners of the same classification.

32.   Cells are generally double bunked; however, Plaintiff was housed alone.

33.   All inmates on 8 East were served and ate their meals in their cells.

34.   When Plaintiff arrived at his first permanent housing at the Main Jail, cell 228 on 8 East, the cell was filthy, with toilet paper and other garbage strewn on the floor.  The toilet and washbasin had not been cleaned, and there was graffiti and dirt on the walls.

35.   Plaintiff requested that the guards provide him with cleaning supplies so that he could clean his cell.  His request was refused.

36.   Plaintiff's meals were served to him through a food slot by sentenced inmate workers. The sentenced inmate workers did not wear gloves or hair nets when they served the food. The food ports were filthy and caked in dried-on food.  The sentenced inmate workers rarely cleaned the food ports.

37.   Under Main Jail policy inmates are to have access to telephones daily.  Plaintiff received access to the telephone approximately one-third of the time.[3]

38.   Shower use is made available each day to all inmates while in the dayroom and may be arranged at other times.  Inmates housed in any Disciplinary Housing Unit are to be provided an opportunity to take a shower once every other day.

39.   On five separate occasions during his stay, Plaintiff did not receive access to a shower or dayroom for more than 48 hours.

---

[3] Defendant claims it was for less than a third of the days while Defendants assert it was for more than a third of the days.  For the purposes of ruling on the motions at bar, the exact number is not critical and the Court has elected to use the "approximately" estimate.

40.   On 37 of the days Plaintiff spent at the Main Jail, he was confined to his cell for 24 hours. On occasions, Plaintiff was not let out of his cell for over 48 hours and sometimes over 72 hours.[4]

41.   Plaintiff was let out of his cell for dayroom, a shower or outdoor recreation on approximately half of the days he was housed in the Main Jail.[5]

42.   Plaintiff was confined to his cell on an average of approximately 22 hours per day.[6]

43.   Unlike other floors reserved for general population inmates, inmates on 8 East were not provided a newspaper, and Plaintiff lacked sufficient funds to subscribe to a newspaper.

44.   Despite filing a formal grievance and a promise to request a newspaper for his pod, Plaintiff was never granted access to newspapers or television.

45.   Under Main Jail Policy, deputies were authorized to use certain types of restraints when moving potentially violent, security risk, or large groups of inmates.

46.   When general population inmates were transported from floor to floor within the Main Jail, including to the basement courthouse, they normally were not restrained at all. When Plaintiff was transported from floor to floor within the Main Jail, including to the basement courthouse, he was shackled with wrist and ankle chains.

47.   Except for one occasion, when Plaintiff was transported to court out of the facility, his wrists were handcuffed and attached to a belly shackle, and his ankles were shackled.

48.   There is no evidence that Plaintiff posed a particular threat of violence or to escape.

49.   It was the policy and practice of the Main Jail to conduct random cell searches and strip searches of inmates.

---

[4] Defendants objected to the phrasing of the undisputed fact as drafted by Plaintiff.  The Court has revised the language used by Plaintiff to account for Defendants' objections.  Defendants also assert that this is disputed, but do not specify precisely what the dispute is.

[5] Plaintiff claims it was for less than half the days while Defendants assert it was for more than half the days.  For the purposes of ruling on the motions at bar, the exact number is not critical and the Court has elected to use the "approximately" estimate.

[6] Plaintiff claims it was for at least 22 hours per day while Defendants dispute that, claiming that the dayroom time received is disputed.  For the purposes of ruling on the motions at bar, the exact number is not critical and the Court has elected to use the "approximately" estimate.

50.  On June 27, 1999, Deputies Mendoza and Kremkin performed a random cell shakedown on Plaintiff and other T-Sep inmates.

51.  During the cell search, Plaintiff was ordered out of his cell and told to sit on the floor in the dayroom.  One extra book and t-shirt, and a piece of paper blocking the glare from the light fixture were found in Plaintiff's cell.

52.  Deputies Mendoza and Kremkin then performed a strip search of Plaintiff in the dayroom in an area that was visible to other inmates, as well as anyone who walked onto the floor, including nurses, psych techs, sentenced inmates, workers, and guards, both male and female.

53.  As part of the strip search, Plaintiff was directed to remove all of his clothing.  Officers Mendoza and Kremkin then directed Plaintiff to open his mouth and lift his tongue, then sweep the inside of his mouth between his lips and gums with his fingers.  The officers then directed Plaintiff to bend over and run his fingers through his hair and shake his head.  He was then told to spread his legs, and lift his penis and scrotum.  The officers then directed him to comb his fingers through his pubic hair.  After this, Officers Mendoza and Kremkin directed Plaintiff to spread his legs, bend at the waist, and spread his buttocks with both hands.

54.  The strip search produced no contraband.  Plaintiff was then directed to put his clothing back on and return to his cell.

55.  Plaintiff was placed on one-hour lock down for June 28 and 29 during which Plaintiff was not permitted to leave his cell.  Plaintiff was not accorded a hearing prior to imposition of the disciplinary lock down nor, although he requested it, was he provided with a copy of the violation report because his violations were deemed minor.

56.  At Atascadero State Hospital, where Plaintiff was housed prior to being transferred to Coalinga, his cell was not locked so he could come and go out of his room for 24 hours a day.  Plaintiff also attended NA/AA meetings at Atascadero.

57.  At Coalinga State Hospital, where Plaintiff is currently confined, Plaintiff's room is not locked, and he can come and go from his room 24 hours a day.  Plaintiff can leave his unit at any time from 6 a.m. to 9 p.m.  Plaintiff holds a job there working as a barber.

Plaintiff and other civil detainees eat meals together in a cafeteria. Plaintiff is able to socialize with other civil detainees and has access to an unmonitored telephone 24 hours a day. Plaintiff has daily access to television and newspapers. Plaintiff is permitted contact visits with family and friends. Plaintiff has access to a law library. Plaintiff has access to a gym Monday through Saturday where he can use the exercise equipment. Plaintiff has not been subjected to strip searches at Coalinga State Hospital.

## V.  STANDARD OF REVIEW

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment in its favor as a matter of law. Fed. R. Civ. P. 56(c); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (*en banc*); *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir. 1989). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986). In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir. 2002). A verified complaint serves as an affidavit for summary judgment purposes. *Lopez v. Smith*, 203 F.3d at 1132 n. 14. The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a fact-finder to resolve the parties' differing versions of the truth at trial. There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In general, in ruling on a motion for summary judgment, a court may not weigh the evidence or judge the credibility of witnesses. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005). Instead, the court generally accepts as true statements made under oath. *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005); *see Williams v. Calderon,* 48 F.Supp.2d 979, 989 (C.D. Cal. 1998) (noting in the context of a habeas claim "[t]he Court is not

to determine issues of credibility on a motion for summary judgment; instead, the truth of each party's affidavits is assumed"), *aff'd sub nom. Williams v. Woodford,* 384 F.3d 567 (9th Cir. 2004).  However, this rule does not apply to conclusory statements unsupported by underlying facts, *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990), nor may the court draw unreasonable inferences from the evidence.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *McLaughlin v. Liu*, 849 F.2d 1205, 1207–1209 (9th Cir. 1988).

## VI.  DISCUSSION

At the time of Plaintiff's confinement the law was clear.  "Persons who have been involuntarilycommitted are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romero*, 457 U.S. 307, 321–22 (1982).  Under *Youngberg*, this Court must render a decision that "reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints."  *Id*, at 321.  Due process requires housing SVPs or other civilly committed individuals "in conditions of reasonable care and safety [and] reasonably nonrestrictive confinement conditions [,]" including "adequate food, shelter, clothing, ... medical care" and personal safety.  *Id.,* at 324.  "[U]nder the Due Process Clause, a [pre-trial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  Under *Bell*, the state "may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."  *Id*., at 536–37.  As the Ninth Circuit stated in *Jones v. Blanas*, 393 F.3d at 932 (citations omitted):

> As civil detainees retain greater liberty protections than individuals detained under criminal process, and pre-adjudication detainees retain greater liberty protections than convicted ones, it stands to reason that an individual detained awaiting civil commitment proceedings is entitled to protections at least as great as those afforded to a civilly committed individual and at least as great as those afforded to an individual accused but not convicted of a crime.

"[D]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed."  *Selling v. Young*, 531 U.S.

250, 265 (2001).  The Ninth Circuit has acknowledged that it is not clearly established how much more expansive the rights of civilly detained persons are than those of criminally detained persons and the rights of SVPA detainees may not be coextensive of those of other civilly detained individuals.  *Hydrick v. Hunter*, 500 F.3d 978, 990 (9th Cir. 2007).  The rights afforded civilly detained persons depends on the circumstances of the detention, and this Court must carefully balance the rights of the individual detained for reasons other than punishment against the state's interest in institutional security and the safety of those housed at the facility.[7]  *See Id.*

Analysis of the pending cross-motions begins with two presumptions.  "[W]hen a SVPA detainee is confined in conditions identical to, similar to, or more restrictive that those in which his criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.' "  *Jones v. Blanas*, 393 F.2d at 932.  Second, "when an individual awaiting SVPA adjudication is detained under conditions more restrictive than those the individual would face following SVPA commitment, we presume the treatment is punitive."  *Id.*, at 933.  To rebut these presumptions, Defendants may establish that retaining Plaintiff in T-Sep served legitimate, non-punitive justifications.  *Id.*  However, Defendants also have the burden of showing that retaining Plaintiff in T-Sep was not excessive in relation to the legitimate, non-punitive objective and why this purpose could not have been met by alternative and less harsh methods.  *Id.*, at 934–35.

It is against this backdrop that the Court must decide the motions at bar.

/

/

---

[7] Defendants' reliance on *Munoz v. Kolender*, 208 F.Supp.2d 1125 (S.D. Cal. 2002), is misplaced. *Munoz* was decided prior to the Ninth Circuit's decisions in *Jones v. Blanas* and *Hydrick v. Hunter* and, except for its treatment of the Eighth Amendment cruel and unusual punishment claim, neither the holdings nor the underpinning rationale is consistent or reconcilable with *Jones* and *Hydrick*.  This Court's original decision, reversed by the Ninth Circuit, rested on the assumption that SVP detainees were *sui generis* and could not be classified with civil detainees.  Most district court decisions post-*Kansas v. Hendricks*, 521 U.S. 326 (1997) reject equal protection claims on this basis, finding no conflict with the Ninth Circuit decisions.  SVP status requires a history of criminal predatory behavior, which historically was not a requisite for civil commitment.  SVP detainees are distinguishable from most pre-trial detainees who have not been convicted of anything while SVP detainees by definition must have prior criminal convictions.  The Ninth Circuit rejected this Court's distinctions, opining that they were foreclosed by *Jones* and *Hydrick*.

A.   *Defendants' Motion for Summary Judgment* [*Docket No. 144*].

Try as they may, Defendants have failed to overcome the *Jones v. Blanas* presumptions. It is clear that confinement in T-Sep is significantly more restrictive than confinement as part of the general jail population.[8]  It is even more restrictive when compared to the confinement Plaintiff faced when committed as a SVP.  Defendants argue that on May 6, 1999, officers did not know where or how to house SVPA detainees other than that they were to be kept separate and apart from criminal detainees as required by California state law.[9]  According to Defendants, SVPA detainees could not be held in the general population, protective custody, or

---

[8] Defendants' argument that detention in T-Sep does not reduce the rights and privileges of the inmates and the conclusory statements in the declaration upon which it is based, are simply unsupported by evidence in the record.  This Court rejects this argument for the same reasons as did the Ninth Circuit in *Jones v. Blanas*, 393 F.3d at 934:

> The significant limitations on, or total denials of, recreational activities, exercise, phone calls, visitation privileges, out-of-cell time, access to religious services, and access to the law library, indicate that in numerous respects confinement in T-Sep was substantially more restrictive than confinement in the Main Jail.

[9] California Penal Code § 4001 provides:

Each county jail must contain a sufficient number of rooms to allow all persons belonging to either one of the following classes to be confined separately and distinctly from persons belonging to either of the other classes:
1. Persons committed on criminal process and detained for trial;
2. Persons already convicted of crime and held under sentence;
3. Persons detained as witnesses or held under civil process, or under an order imposing punishment for a contempt.

California Penal Code § 4002 provided (prior to its amendment in 2001):

Persons committed on criminal process and detained for trial, persons convicted and under sentence, and persons committed upon civil process, shall not be kept or put in the same room, nor shall male and female prisoners, except husband and wife, sleep, dress or undress, bathe, or perform eliminatory functions in the same room.  However, persons committed on criminal process and detained for trial may be kept or put in the same room with persons convicted and under sentence for the purpose of participating in supervised activities and for the purpose of housing, provided, that the housing occurs as a result of a classification procedure is based upon consideration of criminal sophistication, seriousness of crime charged, presence or absence of assaultive behavior, age, and other criteria that will provide for the safety of the prisoners and staff.  Nothing in this section shall be construed to impose any requirement upon a county to confine male and female prisoners in the same or an adjoining facility or impose any duty upon a county to establish or maintain programs which involve the joint participation of male and female prisoners.

administrative segregation, because to do so would necessarily cause Plaintiff to be held with criminal inmates in violation of California state law.  Defendants further argue that officers were concerned about the safety, particularly violence among detainees if SVPA detainees were placed with other SVPA detainees or civil detainees.[10]  In effect, the claim of justification is one of ignorance, *i.e.,* "we did not know how to classify Plaintiff so we placed him in the most restrictive classification."[11]  This attempt at justifying retention of Plaintiff in T-Sep rather than classifying him as a civil detainee is belied by the undisputed evidence that Plaintiff was housed as a civil detainee two years earlier and the current policy of housing SVPA detainees as civil detainees.[12]  Defendants also argue that since there was no "intent" to punish Plaintiff in placing him in T-Sep, it was not punitive.  Defendants overlook the alternative objective test for determining whether the restriction is punitive—that the restrictions are excessive in relation to the asserted non-punitive objective.  *Bell v. Wolfish*, 441 U.S. at 538; *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004).

    Defendants are not entitled to judgment in their favor, and the motion for summary judgment at Docket No. 144 will be DENIED.

B.     *Plaintiff's Motion for Summary Judgment [Docket No. 139].*

    In his motion, Plaintiff seeks summary judgment in his favor as to Defendants' liability for violation of his First and Fourth Amendment rights, as well as his causes of action for

---

[10] The "evidence" of this is the Declaration of Sgt. Dillon and the deposition testimony of Capt. Harris.  First, as Plaintiff in his objections to that portion of the Dillon Declaration correctly points out, from the declaration itself, it does not appear that Sgt. Dillon had any first-hand knowledge of the reason or reasons Plaintiff was assigned to T-Sep.  Second, the referenced testimony of Capt. Harris talks in terms of his experience with SVPA detainees, but makes no reference whatsoever to the reasons for classifying Plaintiff.

[11] Noticeably absent from the record is any evidence as to the reason the Sheriff, who made the final decision, placed Plaintiff in T-Sep.  Also noticeably absent from the record is any evidence as the reason the classifying officer recommended T-Sep, or that he even did.

[12] The Court notes that in 2001 California Penal Code § 4002 was amended to provide that SVPA detainees are to be held in administrative segregation.

violation of his substantive due process, procedural due process, and privacy rights under the Fourteenth Amendment.[13]

To state a claim under § 1983, a plaintiff must establish both (1) the deprivation of a right secured by the federal Constitution or statutory law, and (2) that the deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988); *Anderson v. Warner*, 451 F.3d 1063 (9th Cir. 2006). In this case, the actions the individual defendants took were undertaken solely because of the power or authority vested in them by the state as custodial officers, thus it is clear that they were acting under color of state law. *See United States v. Classic*, 313 U.S. 299, 326 (1941). A point Defendants appear to concede. That leaves two unresolved issues: (1) that Plaintiff's federally protected rights were violated and (2) the liability of each Defendant for the deprivation of Plaintiff's federally protected right or rights.

Civil rights liability may be imposed upon an individual defendant when the individual: (1) does an affirmative act that results in the deprivation of the plaintiff's federally protected rights; (2) participates in affirmative acts of another that, acting concurrently, results in deprivation of the plaintiff's federally protected rights; or (3) fails to perform an act that he is legally required to do, which causes deprivation of federally protected rights. *Hydrick v. Hunter*, 500 F.3d at 988, citing *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Although there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the constitutional violations of subordinates if the supervisors either participated or directed the acts, or knew of them and failed to act to prevent them. *Id.* In addition, the requisite causal connection can be established when a person sets in motion a series of acts by others that the actor knows or reasonably should know would cause others to inflict the constitutional injury. *Id.*

Municipalities are "persons" under 42 U.S.C. § 1983 and thus may be liable for causing a constitutional deprivation. *Monell v. Dept. of Social Svcs of City of New York,* 436 U.S. 658, 690

---

[13] Plaintiff also argues that, as a civil detainee, he cannot be housed at the main jail at all, citing *Lynch v. Baxley*, 744 F.2d 1452, 1461 (11th Cir. 1984). As did the Ninth Circuit in *Jones v. Blanas*, 393 F.3d at 932, this Court need not reach that issue. Remand to the Sacramento County Jail was pursuant to a court order under state law; the defendants in this case had no control over that decision and are not the proper parties against whom an action challenging the validity of retention in the county jail may be brought.

(1978).   However, a municipality "cannot be held liable under § 1983 on a *respondeat superior* theory," that is, "*solely* because it employs a tortfeasor." *Id.* at 691 (emphasis in original). Instead, it is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible. *Id.* A policy is " 'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " *Fairley v. Luman,* 281 F.3d 913, 918 (9th Cir. 2002) (per curiam). Relying on *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1479, 1474 (9th Cir. 1992), Defendants contend that Plaintiff must show and has not shown that the policy amounts to "deliberate indifference" to Plaintiff's rights. However, "deliberate indifference" is not an element under a Fourteenth Amendment claim regarding conditions of confinement. *Jones v. Blanas*, 393 F.3d at 934. Moreover, deliberate indifference occurs when the need for more or different action "is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers [of the County] can reasonably be said to have been deliberately indifferent to the need." *City of Canton Ohio v. Harris*, 489 U.S. 378, 390 (1989).

The liability of Sacramento County under *Monell* in this case turns upon whether the County Sheriff is a policymaker on behalf of the County.[14] It is clear under controlling law that a County Sheriff is the relevant policymaker when acting in the role of administrator of the county jail, and the County is liable for his policy decisions. *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1189–90 (2002). Defendants seem to argue that there was no "policy" simply because (1) there was nothing in the Main Jail Operations Orders concerning retention of SVPA detainees and (2) because the officers did not know how to classify Plaintiff—he didn't seem, at least in Defendants' view, to fit any other classification—he was placed in T-Sep. It is undisputed that the Sheriff made the final decision to place Plaintiff in T-Sep. A municipality can be held liable even for an isolated constitutional violation when the person causing the violation has final policymaking authority. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). While there may

---

[14] The briefing by the parties on this subject is inadequate. Plaintiff assumes, without explanation, there was a policy, while Defendants assume, without explanation, that there was no policy.

not have been a pre-existing policy concerning the housing of SVPA detainees, the decision of the Sheriff to detain Plaintiff in T-Sep was at least an *ad hoc* policy decision and, as it turned out was, insofar as Plaintiff's detention was concerned, the final policy decision.[15]  Accordingly, to the extent that the decision of the Sheriff to place Plaintiff in T-Sep constituted a violation of Plaintiff's federally protected rights, the County is liable.  In addition, to the extent that correctional officers violated Plaintiff's civil rights in carrying out Main Jail policy in accordance with the dictates of that policy, as the final decision maker on matters of jail policy, the Sheriff and, through him, the County are liable.

 1.  <u>Substantive Due Process (Seventh Cause of Action)</u>.  As noted above, Defendants have failed to rebut the *Jones v. Blanas* presumptions that Plaintiff's retention in T-Sep was punitive.  However, these presumptions, while sufficient to defeat summary judgment in favor of the Defendants, standing alone, are not sufficient to support the grant of summary judgment to Plaintiff.  *See* Fed. R. Evid. 301;[16] *St Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11 (1993) (explaining the effect of Rule 301 as not shifting the burden of persuasion or proof).  Thus, the Court must analyze the undisputed evidence to determine whether Plaintiff's substantive due process rights have been violated as a matter of law.

 The undisputed facts in this case clearly establish that the restrictions imposed on Plaintiff, as well as the conditions under which he was detained, were clearly excessive in relation to the purpose of either keeping criminal and civil detainees separate or for institutional security and safety.  *Jones v. Blanas*, 393 F.2d at 934.  Although the exact average hours per day that Plaintiff was held in what was essentially solitary confinement is somewhat in dispute, it is obvious from a cursory review of the diary maintained by Plaintiff and the Main Jail floor logs

---

 [15] The Court also notes that the failure to adopt a procedure that would resolve the problem may itself establish a policy.  *See Oviatt ex rel. Waugh v. Pearce*, 954 F.2d at 1477.

 [16] Federal Rule of Evidence 301 provides:
In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

that Plaintiff was isolated for prolonged periods of time and was not even accorded the same consideration as those who were segregated from the general population for disciplinary or other legitimate penological purposes.  In the absence of any evidence that this highly restrictive confinement served some particularized non-punitive objective,[17] the only logical explanation is that it was directly connected to and resulted from Plaintiff's T-Sep status.  Plaintiff, unlike general population inmates, was shackled when transported from the floor.  Other than to argue that imposition of restraints in transporting detainees is discretionary with the transporting correctional officer,[18] Defendants offer no evidence that restraining Plaintiff was necessary.[19] Plaintiff had a clearly established right to freedom from unreasonable body restraints. *Youngberg v. Romero*, 457 U.S. at 316.  Plaintiff was denied access to showers on a substantial number of days.  Plaintiff was also placed in an unsanitary cell, denied the means with which to clean the cell, and served his meals under less than sanitary conditions.  Plaintiff had a clearly established right not to be exposed to such unsanitary conditions.  *Hydrick v. Hunter*, 500 F.3d at 997.  It also appears that Plaintiff was deprived of any opportunity to exercise for substantial periods of time.  The Ninth Circuit recently held that, as applied to County prisoners held in administrative segregation, exercise time of 90 minutes per week did not comport with constitutional standards and such a severe curtailment of detainees' ability to exercise evidences its punitive intent.  *Pierce v. County of Orange*, ___ F.3d ___, 2008 WL 762072, * 13 (9th Cir. March 24, 2008).

---

[17] The Supreme Court has described the continuum of possible punishments as being solitary confinement at the higher end to a few hours of mandatory community service at the lower end.  *See Samson v. California*, 547 U.S. 843, 848 (2006).

[18] Mail Jail Operations Order provides that  "Deputies may have the option of using any of the following types of restraints when moving potentially violent, security risk, or large groups of inmates."

[19] Somewhat obliquely, Defendants contend that since Plaintiff had been previously adjudicated a "Sexually *Violent* Predator" (emphasis added) and was considered a potential threat to the community, safety was a concern.  This generalization does not justify the restraints placed upon Plaintiff in the absence of some particularized evidence that Plaintiff posed a threat to institutional security or safety, *i.e.*, that Plaintiff posed a threat to either other inmates or correctional officers, or escape.  The absence of any evidence, in particular the lack of any disciplinary action related to security or safety during Plaintiff's confinement, shows such restraints were unnecessary.

The Court finds that no reasonable rational jury could find that the placement of Plaintiff in T-Sep and the conditions under which he was housed did not violate Plaintiff's substantive due process rights as defined by the Supreme Court or the Court of Appeals for the Ninth Circuit. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., supra.* Nor could such a jury not find that the decision to place Plaintiff in T-Sep, the most restrictive form of detention, was not in "deliberate indifference" to Plaintiff's established right as a civil detainee to more considerate treatment than a criminal detainee, especially in light of Plaintiff's prior detention as a civil detainee. Accordingly, Plaintiff is entitled to judgment in his favor on his Seventh Cause of Action (substantive due process claim) as against Sheriff Lou Blanas and the County of Sacramento;[20] however, all other defendants are entitled to summary judgment in their favor on the Seventh Cause of Action.[21]

2. <u>Violation of First Amendment Rights (First Cause of Action)</u>. Plaintiff's First Amendment claim rests upon a two-leg foundation. First, that placing him in T-Sep, which by its very nature deprived Plaintiff of contact with any other prisoners and, for the most part, the rest of the world, denied him his freedom of association. Second, that in housing him in a pod without a television or newspaper, Plaintiff was denied his right to freedom of speech.

a. **Freedom of Association**. As Plaintiff candidly acknowledges, freedom of association, although not entirely abrogated, is one that is significantly abridged by the very fact of incarceration. *See Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003). Here, the abridgement of his right of association was exacerbated by the fact that he was placed in T-Sep. Indeed, as the undisputed facts clearly establish, Plaintiff was essentially retained in solitary confinement. In addition to the overall restrictions on his interaction with others, Plaintiff was denied any

---

[20] Sheriff Blanas was the decision maker on classifying Plaintiff as T-Sep, which was the sole act constituting a violation of Plaintiff's substantive due process claim. Accordingly, only the Sheriff and the County may be held liable for the substantive due process claim that arises out of that classification. No other defendant may be held liable as a matter of law.

[21] This Court may *sua sponte* enter summary judgment in favor of a non-moving party when, as in the case at bar, the moving party has had a full and fair opportunity to ventilate the issues and under the facts it appears that the moving party could not prevail even if a trial were held. *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311–12 (9th Cir. 1982).

participation in communal religious services and AA/NA meetings, deprivations that would not occur if Plaintiff were housed with the general population or after commitment. As the Supreme Court in *Overton*, this Court need not define with any degree of precision the parameters of the retained right of association of an SVP civil detainee. In the case at bar, isolation was almost total, clearly excessive. Unlike, *Overton*, however, as discussed in detail above in VI.A., the extreme degree of isolation in this case does not serve any legitimate penological interest. Although the First Amendment association rights of detainees may be restricted, those restrictions must be reasonably related to a legitimate penological purpose, and to the extent they are excessive, they violate the retained First Amendment rights. *See Turner v. Safley* , 482 U.S. 78, 89, 93 (1987).

The Court finds that no reasonable rational trier of fact could find that the degree of isolation imposed was not excessive. Accordingly, Plaintiff is entitled to judgment in his favor on his First Cause of Action. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., supra*. As previously noted, this was a natural consequence of Plaintiff's T-Sep classification, which was a decision made by the Sheriff, and the liability for the natural consequences flowing from that decision are restricted to the Sheriff and the County.[22]

b. **Deprival of Newspaper and Television**. It is undisputed that Plaintiff was deprived of newspaper and television access. It is also undisputed that Plaintiff lacked the financial resources to subscribe to a newspaper. The plurality and two dissenting justices in *Beard v. Banks*, 548 U.S. 521 (2006), recognized a First Amendment right in incarcerated persons to access printed materials, including newspapers. While recognizing the existence of this right, Defendants argue that there is no constitutional right to a *free* newspaper. The Court agrees, there is no established First Amendment right to receive a free newspaper or, for that

---

[22] The "solitary confinement" aspect of Plaintiff's retention was considered as a factor in determining Plaintiff's retention was "punitive" in connection with Plaintiff's substantive due process rights were violated. As a stand-alone First Amendment claim it probably adds little to the case in the sense that any damages flowing from the First Amendment violation would likely be subsumed by the substantive due process claim.

matter, television.  Accordingly, on the issue of access to newspapers and TV Plaintiff is not entitled to summary judgment in his favor.[23]

Plaintiff is entitled to judgment in his favor on his First Cause of Action (First Amendment claim) as against Sheriff Lou Blanas and the County of Sacramento; all other defendants are entitled to summary judgment in their favor on the First Cause of Action.[24]

3.  <u>Violation of Fourth Amendment Rights (Second Cause of Action)</u>.

Plaintiff contends that his Fourth Amendment rights were violated in two respects: (1) the random strip search following the cell search and (2) by the utilization of restraints when transporting him to any place within or without the Main Jail other than on the floor on which he was housed.[25]

a.  **Strip Search**.  Strip searches are not unreasonable *per se*.  *Bell v. Wolfish, supra*, 441 U.S. at 558;[26] *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988).  However, the strip search must be reasonably related to some legitimate penological purpose.  *Id*.  In *Bell*, the Supreme Court articulated the following test to determine the reasonableness of a search (441 U.S. at 559):

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place which is conducted.

---

[23] The Court notes that although Plaintiff does not have a stand-alone First Amendment claim on this point, the fact that TV and newspapers were available to inmates in general population and those in a disciplinary classification housed other than in 8 East was a factor considered in determining that Plaintiff's retention was "punitive" in connection with finding that Plaintiff's substantive due process rights were violated.

[24] *See* note 21.

[25] Plaintiff does not challenge the random search of his cell.

[26] *Bell* upheld the use of a strip search of a pre-trial detainee following a contact visitation.  In this case, the last visitation Plaintiff had was June 17, 1999, ten days prior to the cell shakedown and strip search; thus, on the facts, *Bell* provides no support for the strip search of Plaintiff..

Thus, this Court must test the reasonableness of the strip search following the *Bell* factors.  *See Thompson v. Souza*, 111 F.3d 694, 700–701 (9th Cir. 1997).

Three of the factors, scope, manner, and place, may be disposed of somewhat summarily. The strip search was visual only.  It did not involve touching of his body by another person. This type of strip search, standing alone, clearly does not constitute an unreasonable search under *Bell* and its progeny.   The search was conducted in the dayroom area of the same floor upon which Plaintiff was housed.  Plaintiff contends that the search should have been conducted in a more private place outside the view of other inmates as well as others who may have had occasion to be present in 8 East.  The Ninth Circuit has considered and rejected this argument. *Thompson*, 111 F.3d at 700; *Michenfelder*, 860 F.2d at 333.[27]

The critical issue is whether, under all the facts and circumstances, the strip search was justified.  A jail policy on strip searches is not "constitutionally acceptable simply by virtue of jail officials' invocation of security concerns . . . rather the policy must be 'reasonably related' to the [detention facility's] interest in maintaining security."  *Way v. County of Ventura,* 445 F.3d 1157, 1161 (9th Cir. 2006).  Defendants contend that the fact that the search of the cell revealed Plaintiff possessed contraband justified the search.[28]  Therefore, according to Defendants, probable cause to search for additional contraband existed.  The contraband found consisted of an extra book, t-shirt, and a piece of paper apparently used to reduce glare from light.  Thus, the question becomes whether the contraband found justified the strip search.  At his deposition, Captain Harris testified with respect to the correlation between finding contraband and conducting a strip search:

---

[27] The Main Jail Operations Order governing strip searches provides in relevant part:  "Strip searches will be conducted in an area of privacy so that the arrestee cannot be viewed by those not participating in the search or having official business in the area.."  The Court notes that the fact the strip search in this case may have been in violation of the Main Jail Operations Order governing strip searches does not necessarily give rise to a violation of Plaintiff's constitutional rights.  *See Sandin v. Conner*, 515 U.S. 472, 481 (1995) (noting that state prison regulations are "not designed to confer rights on inmates").

[28] The Main Jail Operations Order governing inmate searches, provides in relevant part that routine inmate searches may be conducted:  "To prevent the introduction of weapons and/or to detect the presence of weapons and/or contraband within the facility."

Q.      If contraband were ever found in the inmate's cell, would a strip search be conducted, a further strip search?

A.      Yes, if you find contraband, then you most likely will strip search them for further evidence of whatever you found.

The nature of the contraband found, while it may be classified as such because inmates were not authorized to possess the items under Main Jail policy, hardly was of a nature that could be secreted on the body. The daily floor logs and Plaintiff's diary show that in the week preceding the shakedown and strip search Plaintiff was allowed out of his cell on two days, June 21 ("O-Rec") and June 25, 1999 ("dayroom"). Other than contact with guards and the inmates who delivered him his food, there is nothing in the record that indicates Plaintiff had contact with any person during the preceding week. Indeed, the very nature of his classification as T-Sep leaves as the only logical conclusion that Plaintiff lacked the opportunity to acquire any item of contraband that could be concealed on the body in such a manner that it could not be discovered by a search less intrusive than a strip search. The Court finds that any reasonable rational trier of fact would find reliance on the discovery of contraband in Plaintiff's cell was pretextual and did not give rise to even the most minimal level of probable cause to justify the search. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., supra*.

b. **Use of Restraints**.

The undisputed facts show that Plaintiff was restrained by wrist and ankle chains at all times when moved from floor to floor and, except for one occasion, when being transported to and from court, his wrists were handcuffed and attached to a belly shackle, and his ankles were shackled. As discussed above in connection with the substantive due process claim, VI.B.1, Defendants have produced no evidence that justified the use of restraints when moving Plaintiff between floors within the jail. As to the question of movement between the jail and court, except as noted above in connection with the substantive due process issue, there is insufficient evidence to determine whether or not the restraints imposed upon Plaintiff violated his Fourth Amendment rights.

Plaintiff has not identified the particular custodial officer or officers involved in restraining him during transport. Defendants admit that the restraint during transport was in

MEMORANDUM DECISION AND ORDER
[Re:  Motions at Docket 139 & 144]
*Cerniglia v. Sacramento County*, 2:99-cv-01938-JKS-DAD     23

accordance with established Main Jail policy.  As the ultimate policymaker, the Sheriff and, through him, the County, are liable under *Monell*.

Plaintiff is entitled to judgment in his favor on his Second Cause of Action (Fourth Amendment claim) as against Deputy Mendoza, Deputy Kremkin,  Sheriff Lou Blanas and the County of Sacramento; all other Defendants are entitled to summary judgment in their favor on the Second Cause of Action.[29]

4.  <u>Violation of Procedural Due Process (Sixth Cause of Action)</u>.

Plaintiff contends that imposing the one-hour lock down on June 28 and 29, precluding him from leaving his cell during those two days, without a hearing violated his procedural due process rights under the Fourteenth Amendment.  Controlling law in this circuit is that due process requires that a pretrial detainee be provided a hearing before being subjected to internal disciplinary action.  *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996).[30]  That admittedly did not occur here.

This Court can discern no principled reason why *Mitchell* should not apply to SVPA civil detainees.  Accordingly, Plaintiff is entitled to judgment in his favor on his Sixth Cause of Action as against Deputy Mendoza, Deputy Kremkin, Sheriff Blanas, and the County Of Sacramento; all other defendants are entitled to summary judgment in their favor on the Sixth Cause of Action.[31]

5.  <u>Violation of Right to Privacy (Tenth Cause of Action)</u>.

As discussed above, Plaintiff was strip searched in the dayroom in plain view of other inmates housed in 8 East as well as any person who might otherwise have occasion to be present in the area.  That a prisoner has at least a limited right to privacy under the Fourth and Fourteenth Amendments is well established in this circuit.  *See Grummett v. Rushem*, 779 F.2d 491, 493–94 (9th Cir. 1985).  It is also established that parolees have a greater expectation of

---

[29] *See* note 21.

[30] Defendants' reliance on *Cephas v. Truitt*, 940 F.Supp. 674 (D.Del. 1996) is misplaced.  This Court is bound by decisions of the Ninth Circuit, not by decisions of the District of Delaware, no matter how persuasive they may be.

[31] *See* note 21.

privacy than do prisoners.  *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) (holding

that a male parole officer walking into a stall in which a female parolee was urinating as part of a

required drug test violated the parolee's right of privacy).  The Ninth Circuit observed 45 years

ago that it could not "conceive of a more basic subject of privacy than the naked body."  "The

desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of

the opposite sex, is impelled by elementary self-respect and personal dignity."  *York v. Story*,

324 F.2d 450, 455 (9th Cir. 1963).  However, even the expectations of bodily privacy from

persons of the opposite sex are extremely limited.  *Jordan v. Gardner*, 986 F.2d 1521, 1524–25

(9th Cir. 1993) (en banc).

 The Court notes that there is no evidence that any other person was actually present in the

dayroom or came onto the floor and observed the strip search.  The only evidence in the record is

that other inmates housed in 8 East *could have* viewed the strip search, but no evidence that

anyone actually did.  In particular, there is a complete dearth of any evidence that the strip search

was observed by a female.  In *Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir. 1997), in

reversing and remanding with directions to grant qualified immunity to the officials, the Court

stated:

> [I]t is highly questionable even today whether prison inmates have a Fourth
> Amendment right to be free from routine unclothed searches by officials of the
> opposite sex, or from viewing of their unclothed bodies by officials of the
> opposite sex. Whether or not such a right exists, however, there is no question
> that it was not clearly established at the time of the alleged conduct. Because
> Somers's lawsuit seeks only monetary damages, not injunctive relief, we do not
> decide whether such a right exists.

*See also Michenfelder*, 860 F.2d at 334 (same).

 Given the state of the law, while the strip search may have violated the Fourth

Amendment right to be free from unreasonable searches and seizures, it did not violate Plaintiff's

right to privacy on a stand-alone basis.  No violation of his rights to privacy having been

established, Plaintiff is not entitled to judgment in his favor on the Tenth Cause of Action.

Under the holding in *Somers*, Defendants are entitled to judgment in the their favor on the Tenth

Cause of Action.

## VII.  ORDER

Based upon the foregoing,

IT IS ORDERED THAT:

1.      Plaintiff's Motion for Summary Adjudication at Docket No. 139, is GRANTED, in part, and DENIED, in part;

2.      Defendants' Motion for Summary Judgment, or, in the alternative, Summary Adjudication, at Docket No. 144 is DENIED;

3.      Judgment is entered in favor of Plaintiff as against Defendants Sheriff Lou Blanas and the County of Sacramento on the issue of liability on his First Cause of Action, reserving for trial thereon the issue of damages;

4.      The First Cause of Action as against Defendants Captain Harris, Sergeant Dillon, Deputy McGuire, Deputy Kobza, Deputy Mendoza, Deputy Kremkin, Deputy Winn, Deputy Edwards, Deputy Harris, Deputy Hidalgo, Deputy Petersen, and Deputy Koontz, is DISMISSED, with prejudice;

5.      Judgment is entered in favor of Plaintiff as against Defendants Deputy Mendoza, Deputy Kremkin, Sheriff Lou Blanas and the County of Sacramento on the issue of liability on his Second Cause of Action, reserving for trial thereon the issue of damages;

6.      The Second Cause of Action as against Defendants Captain Harris, Sergeant Dillon, Deputy McGuire, Deputy Kobza, Deputy Winn, Deputy Edwards, Deputy Harris, Deputy Hidalgo, Deputy Petersen, and Deputy Koontz, is DISMISSED, with prejudice;

7.      Judgment is entered in favor of Plaintiff as against Defendants Deputy Mendoza, Deputy Kremkin, Sheriff Lou Blanas and the County of Sacramento on the issue of liability on his Sixth Cause of Action, reserving for trial thereon the issue of damages;

8.      The Sixth Cause of Action as against Defendants Captain Harris, Sergeant Dillon, Deputy McGuire, Deputy Kobza, Deputy Winn, Deputy Edwards, Deputy Harris, Deputy Hidalgo, Deputy Petersen, and Deputy Koontz, is DISMISSED, with prejudice;

9.      Judgment is entered in favor of Plaintiff as against Defendants Sheriff Lou Blanas and the County of Sacramento on the issue of liability on his Seventh Cause of Action, reserving for trial thereon the issue of damages;

10.     The Seventh Cause of Action as against Defendants Captain Harris, Sergeant Dillon, Deputy McGuire, Deputy Kobza, Deputy Mendoza, Deputy Kremkin, Deputy Winn, Deputy Edwards, Deputy Harris, Deputy Hidalgo, Deputy Petersen, and Deputy Koontz, is DISMISSED, with prejudice;

11.     The Tenth Cause of Action is DISMISSED, with prejudice, as to all parties; and

12.     Plaintiff's objections to the introduction of evidence at Docket Nos. 163, 202, and 207 are OVERRULED, as moot.

    Dated:  April 18, 2008

                              s/ James K. Singleton, Jr.
                         JAMES K. SINGLETON, JR.
                         United States District Judge